UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

CORTEZ RAMONE WYNN,
   Plaintiff,

vs.                                              No. 05-4086

ANDREA LASHBROOK, et.al,
   Defendants.

SUMMARY JUDGEMENT ORDER

     This cause is before the court for consideration of the defendants' motions for summary judgement. [d/e 44, 46].

## I.  BACKGROUND

     The plaintiff, a pro se prisoner, filed this case pursuant to 42 U.S.C. §1983 against seven defendants at the East Moline Correctional Center including Acting Healthcare Administrator Andrea Lashbrook, Warden Gene Jungwirth, Dr. William Rankin, Dietary Director Keith Renkosik, Assistant Dietary Director Mike Skafidas, Food Supervisor Francisco Sierre and Food Supervisor Steve Naftzger.  The plaintiff alleges that the defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment.

     Specifically, the plaintiff alleges when he showed up to work on May 25, 2005, his hand was obviously injured, but the dietary department defendants would not let him go to the health care unit.   When the plaintiff finally did receive care, X-rays revealed that his hand was broken.   The plaintiff says he did not receive proper care for his hand and it did not heal properly.

     On January 18 , 2007, the defendants filed a motion for sanctions stating that the plaintiff had failed to cooperate in efforts to take his deposition. [d/e 31].   The court granted the motion in part and denied the motion in part.  The court refused to dismiss the case, but ordered the plaintiff to pay the court reporter's costs for the previously scheduled deposition.  The plaintiff was also admonished that he must appear for his next deposition or his case would be dismissed.

     The defendants filed their motions for summary judgement on July 27, 2007 and August 24, 2007.  The plaintiff was notified when the first dispostive motion was filed. [d/e 45].   The plaintiff has not filed any motions or documents with the court since that time.  Therefore, the court will consider the motions for summary judgement without input from the plaintiff.

## II.  FACTS

     The following facts are taking from the defendants' motions. The plaintiff was incarcerated in the Illinois Department of Corrections in May of 2005, but was released from custody on June 22, 2006.

On May 24, 2005, the plaintiff injured his hand while playing softball. The plaintiff did not immediately inform anyone of this injury. (Def. Mot, Plain, Depo, p. 27). The next day, the plaintiff went to his job assignment at the dietary unit in East Moline Correctional Center. The plaintiff says he was scheduled to report to work by 8:00 a.m. and his job involved mopping, sweeping, stacking dishes, washing windows and other tasks.

The plaintiff showed his hand to Food Supervisor Francisco Sierra. The plaintiff says his hand was swollen, but had no open wounds. (Def. Mot, Wynn Aff,. P. 35) Defendant Sierra asked the plaintiff why he did not tell someone about the injury sooner and the plaintiff said the pain had increased. The plaintiff asked to go the Health Care Unit.

Defendant Sierra says he called the Health Care Unit and explained the situation. "They directed me to have Mr. Wynn sign up for the 6:00 p.m. sick call request, which was the regular time for inmates who worked the dietary unit." (Def. Mot, Sierra Aff, p. 1). Defendant Sierra says he told the plaintiff he would have to sign up for sick call and would not be able to go immediately to the Health Care Unit.

The plaintiff says he showed his hand to Defendants Renkosik, Skafidas and Naftziger but all told him he would have to wait until the 6:00 p.m. sick call list for dietary workers. In his deposition, the plaintiff admits he does not know if the defendants called the Health Care Unit. (Def. Memo, Plain Depo, p. 32) The plaintiff says Defendant Renkosik tried to personally sign the plaintiff up for the 6:00 sick call list. (Def. Mot, Wynn Aff, p. 36) Instead, the plaintiff decided to go to the Health Care Unit as soon as his shift had ended at 1:00 p.m. that afternoon and his hand was put in a temporary splint.

Dr. Rankin was the Medical Director at East Moline Correctional Center. The defendant says medical records demonstrate Mr. Wynn was first seen in the healthcare unit on May 25, 2005, when he reported that he fell on his left hand while playing baseball. The plaintiff first saw Dr. Rankin on May 26, 2005. (Def. Memo, Rankin Aff. p. 1)

The doctor examined the plaintiff's hand, ordered X-rays and ordered the plaintiff to remain off work for the next week. The X-rays showed a "fracture of his fourth metacarpal." (Def. Memo, Rankin Aff, p. 2). (Def. Memo, Rankin Aff. P. 1) The doctor explains this was a fracture of the ring finger on the plaintiff's left hand. The broken bone was the bone that extends from the hand to the knuckle. (Def. Memo, Rankin Aff. p. 9)

The doctor saw the plaintiff again after the X-ray results. He told the plaintiff to wear the splint for four weeks and ordered a new X-ray in three weeks. The doctor also ordered restricted movement of the plaintiff's left hand for three weeks. Dr. Rankin says at this point, he believed the fracture could be treated with the splint.

The new X-rays were taken on June 20, 2005. The doctor then met with the plaintiff on June 23, 2005. The X-ray revealed a continued fracture in the same location. The plaintiff reported that he had not been using his left hand and had rarely taken the splint off. The plaintiff also stated that he felt well. The doctor scheduled the plaintiff for another X-ray to recheck the injury in mid

July. (Def. Memo, Rankin Aff. p. 3)

The plaintiff had X-rays taken again on July 12, 2005.  The X-ray showed marginal improvement.   The doctor met with the plaintiff again on July 15, 2005.  The doctor says "[a]t that time, I considered and recommended that Mr. Wynn be seen by an outside orthopedic physician for further evaluation." (Def. Memo, Rankin Aff. P. 4)

On July 21, 2005, the plaintiff was seen by an outside orthopedic surgeon who noted:

> Assessment: Slight pain with palpitation. Callous formation seen on X-ray.
> Reviewed films with Dr. Connolly.  Good placement. Due to type of fracture,
> he states it takes a long time for fracture to look radiographically healed.
> Recommendations/Plans: Wear splint for 2 to 3 weeks- take splint off when
> patient by himself to start range of motion with fingers. No heavy lifting
> with left hand. Recheck with X-ray in one month. (Def. Memo, Ex 1-M)

Dr. Rankin says he reviewed the recommendations and followed them. (Def. Memo, Ex. 1-G).    X-rays were again taken on August 10, 2005.  The X-ray showed a continued fracture with some callous formation.  The plaintiff complained that he could not flex his fourth and fifth fingers fully.  Dr. Rankin recommended that the plaintiff continue to do range of motion exercises and follow up with the orthopedic physician later in the month.  The doctor also ordered no work for 30 days. (Def. Memo, Rankin Aff. p. 4-5)

Dr. Rankin says his next note was on September 23, 2005.  The doctor noted that the plaintiff had not been able to return to the orthopedic doctor and an X-ray was planned for the next day.

The plaintiff saw Dr. Rankin on September 26, 2005.  The X-ray did show healing of the fracture.  The plaintiff complained that he had trouble making a fist.  The doctor examined the plaintiff's hand and also noted some tenderness.  The doctor recommended that the plaintiff stop using the splint, continue range of motion exercises and limit the use of his left hand for one month.  The doctor also noted that the plaintiff was to follow up with the orthopedic doctor for further evaluation.

The plaintiff was sent out for further evaluation on October 11, 2005.  Dr. Connolly noted that the fracture had healed.  The plaintiff still had some stiffness in his ring finger.  The doctor recommended that the plaintiff continue active range of motion with his ring finger and noted there should be follow up if needed.   Dr. Rankin reviewed the recommendations and noted them in the plaintiff's medical chart.  "As of October 12, 2005, it was my assessment, in conjunction with that of the orthopedic physician, that Mr. Wynn's fracture finger was healed." (Def Memo, Rankin Aff, p. 7)

The plaintiff was seen in the health care unit in November and December of 2005 for problems unrelated to his hand.  Dr. Rankin saw the plaintiff on April 10, 2006 for a problem unrelated to his hand and the plaintiff told the doctor that his hand was good.

Dr. Rankin says he is aware of no information which would indicate that the plaintiff would have healed better or had a different outcome if he had a cast as opposed to a splint. Dr. Rankin says in his opinion, the plaintiff "had an excellent outcome following the injury..." (Def. Memo, Rankin Aff., p. 9).

Healthcare Administrator Andrea Lashbrook says her job is to coordinate and review activities in the Health Care Unit in coordination with the Medical Director. The defendant also responds to inmate grievances by reviewing medical records and consulting with the medical staff. Defendant Lashbrook says she responded to the plaintiff's concerns about his medical care. "When appropriate, I forwarded his concerns to the prison's medical staff for their review. I had no authority to override the decisions made by the medical staff and was never aware of any refusal by medical staff to provide needed treatment to Mr. Wynn." (Def. Memo, Lashbrook Aff, p. 2)

The plaintiff was released from the Illinois Department of Corrections on June 22, 2006. The plaintiff says he has not seen a doctor with respect to this finger injury since his release. The plaintiff says his finger does occasionally feel stiff. However, the plaintiff says he does not experience pain, can make a fist with his hand, is not impeded at work and has not had other difficulties. (Def. Memo, Plain Dep, p. 9)

### III. LEGAL STANDARD

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56©. Any discrepancies in the factual record should be evaluated in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (*citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). The party moving for summary judgment must show the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

"Summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events. *Johnson v. Cambridge Indus.*, Inc., 325 F.3d 892, 901 (7th Cir. 2000). A party opposing summary judgment bears the burden to respond, not simply by resting on its own pleading but by "set[ting] out specific facts showing a genuine issue for trial." *See* Fed. R. Civ. P. 56(e). In order to be a "genuine" issue, there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986). "If [the nonmovant] does not [meet his burden], summary judgment should, if appropriate, be entered against [the nonmovant]." Fed. R. Civ. P. 56(e).

Affidavits must be based on the personal knowledge of the affiant and "set out *facts* that would be admissible in evidence." Fed. R. Civ. P. 56(e) (emphasis added). Personal knowledge may include inferences and opinions drawn from those facts. *Visser v. Packer Eng. Assoc., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991). "But the inferences and opinions must be grounded in observation or

other first-hand personal experience. They must not be based on flights of fancy, speculations, hunches, intuitions or rumors remote from that experience." *Visser*, 924 F.2d at 659.

## IV. ANALYSIS

The defendants argue that the plaintiff cannot demonstrate that they were deliberately indifferent to the plaintiff's medical condition. The plaintiff must pass both an objective and a subjective test in order to establish that the lack of appropriate medical care violated the Eighth Amendment. *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981); *Wilson v. Seiter,* 501 U.S. 294, 297 (1991). The plaintiff must first demonstrate that the alleged deprivation was sufficiently serious. *Id.* The plaintiff must also show that the defendants acted with deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). Inadequate medical treatment due to negligence or even gross negligence does not support an Eighth Amendment violation. *Shockley v Jones*, 823 F.3d 1068, 1072 (7th Cir. 1987). In addition, inmates are not entitled to a specific type of treatment, or even the best care, only reasonable measures to prevent a substantial risk of serious harm. *Forbes v. Edgar,* 112 F.3d, 262, 267 (7th Cir. 1997).

"[P]roof of deliberate indifference may be found where a prison official intentionally denies or delays access to medical care or intentionally interferes with the treatment once prescribed." *Jones v. Natesha* ,151 F.Supp.2d 938, 945 (N.D. Ill. 2001). A delay in scheduling an appointment for medical treatment may constitute deliberate indifference. *Jones v. Simek*, 193 F.3d 485, 490-491 (7th Cir. 1999) However, "an inmate who complains that delay in medical treatment rose to constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." *Langston v Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996).

The plaintiff admits he did not seek medical treatment when he first injured his hand. The plaintiff did not ask for medical care until the next day when he showed up for work. Defendants Sierra says he contacted the Health Care Unit as soon as the plaintiff showed him his swollen hand, and was told the plaintiff should sign up for sick call. The plaintiff has failed to respond to the dispositive motion so there is no evidence before this court that the plaintiff was in such pain that he could not continue with his job. In addition, there is no evidence that the delay from 8:00 a.m. to 1:00 p.m. had any impact on the plaintiff's injury.

In addition, there is no evidence before this court that Dr. Rankin was deliberately indifferent to the plaintiff's medical condition. The medical records demonstrate that the plaintiff received on- going care from both Dr. Rankin and an outside orthopaedic doctor until his injury healed.

Finally, there is no evidence that Healthcare Administrator Lashbrook or Warden Jungwirth were deliberately indifferent. "If a prisoner is under the care of medical experts....a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." *Spruill v Gillis,* 372 F.3d 218 (3rd Cir. 2004). In addition, there is no evidence the plaintiff was not receiving adequate and appropriate medical care for his injury.

**ITS IS THEREFORE ORDERED that:**

**1) The defendants' motions for summary judgement are granted pursuant to Fed. R. Civ. P. 56. [d/e 44, 46]   The clerk of the court is directed to enter judgment in favor of the defendants in accordance with this order.  The parties are to bear their own costs.  This case is terminated.**

**2) If the plaintiff wishes to appeal this dismissal, he may file a notice of appeal with this court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4).  If the plaintiff does choose to appeal, he will be liable for the $455.00 appellate filing fee irrespective of the outcome of the appeal.**

**3) Although his case has been dismissed, the plaintiff is still obligated to pay the $250.00 filing fee in full.   Release from incarceration does not relieve the plaintiff of his obligation to pay the filing fee in full.**

**4) The plaintiff must notify the clerk of the court of a change of address and phone number within seven days of such a change.  Release from incarceration does not relieve the plaintiff of his obligation to pay the filing fee in full.**

**5) The plaintiff is reminded that on June 25, 2007, he was ordered to pay the defendants' cost of hiring a court reporter.  The plaintiff is advised that he owes $70 for this expense.**

Entered this 7th day of March, 2008.

s\Harold A. Baker
_____
HAROLD A. BAKER
UNITED STATES DISTRICT JUDGE